Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is number 24-1966, Christopher Alicea v. Cincinnati Incorporated. At this time, would counsel for the appellant please come to the podium and introduce himself on the record to begin. Good morning, your honors. Robert Foster for the plaintiff appellant, Christopher Alicea, as personal representative of the estate of Luis Prieto. May it please the court, I'm pleased to have Mr. Alicea and his family in the courtroom with us today because this is a case about a preventable death that should have never happened. Luis Prieto died at 25 years old and the crux of this case is that his death wouldn't have happened if Cincinnati Incorporated had implemented simple, feasible safety mechanisms, such as a safety mat, which would have shut down the machine when Mr. Prieto stepped into the area between the machines, making it impossible for his co-worker to activate the machinery and bring the steel bar down on top of Mr. Prieto. So does that depend on whether there ever should have been people in that space? I mean, it seems to me that if no one should ever be in there and you've done things to keep people out, that's what you should do. So I guess my question is, was there evidence that despite the, let's assume for a second there was fencing on both sides, nevertheless people would go into that space to clean up scrapings or other, that that should be an expectation of the company? Yes, your honor. There was evidence in this case, specifically the testimony of Daniel Pond, Mr. Prieto's predecessor, who did the exact same job immediately before him, and he testified that he often needed to go into that area to clean up slag and other pieces of metal, and that he did so by shimmying in between the machines, and that that was the easiest way to get in there. There was evidence from OSHA that in issuing its violation, stating that workers needed to get into that area. Plaintiff's expert, William Gillette, he opined that there were work-related reasons to go into that area, and that Cincinnati would have been aware of those reasons. Counsel, what is the status of that Pond testimony? Is that actually part of the record? It seems a little unclear how the judge handled that. Was it, there was a dispute whether that testimony was admissible. Did he admit it for all purposes? That's right, your honor. The district court judge, as far as I could tell, did not, never concluded that that testimony was inadmissible. He simply stated that the testimony was not germane to the question of Cincinnati's responsibility for Mr. Prieto's death. That testimony is part of the record, and I think it's valuable testimony for a jury to hear in assessing whether or not workers like Mr. Prieto needed to enter that area. So really another way of saying that is the judge just concluded that that testimony does not create a disputed fact about something that's important. I mean, that's another way to think about it, right? I mean, it's just, you could say, oh, he said it was irrelevant, but another way to think about that is that it just doesn't move the needle for me on your claim. That's correct, your honor, and of course, we disagree. It is our position that a jury could certainly infer from Mr. Pond's testimony that Mr. Prieto So is that how you do it? I mean, the question is, what was Cincinnati thinking when it created this grouping of machinery, right? Should they have anticipated people would be in there such that they should have something more than fencing on the outside to stop the machine if it started to run while someone was in there? And so I guess my question to you is, does it matter that Mr. Pond, some many years later, is engaging in a certain kind of conduct? Like, how does that bear on what Cincinnati should have known or thought at the time it designed the product? Well, Cincinnati itself, by its own specifications for the product, called for an awareness barrier, a guard, to be placed between the machines. Clearly, they anticipated that workers would need to get in between them. I can think of like, we want no one in there. Like, no one should ever go in there, and we're going to put up gates so that everyone knows not to go in there. And if the thought of the product was, no one will ever go in there, and we've gated the product, then that seems maybe like that's sufficient. But it seems like your argument is, but no, like, generally people shouldn't be going in there. But maybe the guy with Mr. Pond's responsibilities should occasionally go in there, and therefore more safety is needed to protect that person. That's exactly right, Your Honor. And so my question to you is, when we think about it, we have to put ourselves, do we have to put ourselves in Cincinnati's shoes when they designed it? Is that right? Is that the right question? What did Cincinnati understand when they designed the product? I think the expert testimony, Mr. Gillette's testimony is relevant on that issue. It was his opinion that Cincinnati should have known that workers needed to go into this area, and that a gate, a barrier between the machines alone, a physical barrier, that was not enough. That Cincinnati needed to implement additional safety mechanisms, like a safety mat, which is a pressure-sensitive device that would have shut the machines down if Mr. Prieto stepped into that area. It would have made it impossible for his co-worker to activate the machinery. A simple device like that. Was there any testimony beyond Mr. Pond's proposed testimony that people would go in there, either on a regular or non-regular basis, industry-wide? Did you attempt to establish any of that? No, Your Honor. There was no other testimony from other workers regarding the need to go into that area. Yes, so that leads me to ask you whether, with respect to Judge Afram's question, whether this is a fact question in your mind? Is it a common law judge question? Is it a mixed question? That is, what Cincinnati should have known? Do you have a view on that? The expert testimony on the issue, I think, is relevant, and I think that from the very fact that Cincinnati's specifications had called for a fence there, indicates that they anticipated that workers would try to get in there. I think a jury could certainly find— I thought the precise question was whether workers should ever go in there. Not that they would try to get in there, but should they go in there? Well, the evidence here is that workers did need to go in there. A jury could believe Mr. Pond's testimony and find workers did need to go in there, and Mr. Prieto did, too. But that's a worker at one time, many years later, was going in there. Is that the sum total of the evidence on the question of did workers need to go in there? I'm sorry, what— Is that the sum total of the evidence that you have on workers needed to go in there such that Cincinnati should have done more? That one worker, years later, at one location, operated in this manner? Well, Mr. Pond was immediately—he was Mr. Prieto's immediate predecessor, who did the exact same work, and he'll testify that he needed to go in there. And Mr. Gillette— Counsel, excuse me. Counsel, excuse me. To some extent, I think your theory is that, look, people make mistakes. They're human. Sometimes they do things that they should not do, including going into this very dangerous area. I thought your theory was that the physical gate issue, at least with respect to your applied warranty of merchantability claim, is really—it's kind of a distraction. My understanding is your theory is that there were—this is undisputed—there were three entry points. It's not really clear, from this record, whether Mr. Prieto went through that open gate area. There were two other points. He could have gone in at two other entry points. And I thought your expert theory was, given those three possibilities, given human frailty, that they should have anticipated the need for a mat that would have automatically prevented the elevator from descending, or a co-worker, seeing what was happening, could have pushed a button and prevented it from happening. So this focus on the physical gate, at least with respect to the merchantability theory, is really kind of irrelevant, isn't it? Yes, Your Honor. And I only reference the physical gate as a piece of evidence from which the jury could infer that Cincinnati knew that workers would need to go in there. You're right that the theory of the case and the expert testimony will be that the barrier alone is insufficient. That's not right, because the gate could have just been, look, this is an attractive nuisance. People might think, oh, it might be fun to go in there. And we don't want that. So we're going to have gates. And if the world was, no one should ever go in there. There would be never any real reason to go in there other than some attractive nuisance like, oh, let's see what it's like in there. Then it seems to me gates would be enough. But if the evidence is, no, in reality, there is a real work-related reason to go in there, then just having gates on the side doesn't do it, because you'd assume that at least one employee whose responsibility it is would go around through the gate, because they're going to do their work. And so I guess my question to you is, the evidence of that is pond and anything else? And the OSHA report and Mr. Gillette, the plaintiff's expert, in his report he writes, there are multiple ways to access the space between the loader and laser. So safety mats are still necessary, especially since there are work-related reasons for operators to enter this dangerous area, as discussed above. It is well known within the industry that workers will often bypass awareness barriers or other guards to work more quickly. Okay. Great. Thank you. Thank you, counsel. Thank you, your honors. At this time, would counsel for the appellee please introduce himself on the record to begin? Good morning, your honors. May it please the court, my name is Christopher Duggan. Andrew Black is with me. We are here for Cincinnati Incorporated. A couple of things to start, if I may, your honors. First, what happened here did not begin on July 12th of 2018. It happened at least two weeks before, as your honors I'm sure know. Mr. Prieto was found in that space where he was not supposed to be, and he knew he was not supposed to be there. Counsel, how does that, I mean that sounds very much like a kind of contributory negligence argument where he was warned not to do it, but he still did it. How does that argument relate to the implied warranty of merchantability? In a couple of ways, your honor. The first is that, as your honor pointed out, there were three different points of entry and there's no way that even Mr. Howard, Mr. Gillette said he couldn't figure out whether or not the barrier would have made any difference at all, first. Second, what he was doing at that time is what Mr. Smith saw him doing. As the thing was coming down, the elevator, extremely dangerous, jumped out and rolled over the top, and just as it came into that space, the bar came into that space, he narrowly missed getting seriously into that. Smith came up... Excuse me. The implied warranty of merchantability claim, you're looking at what the company knew at the time that it created the machinery, put it into the flow of commerce. That's a much earlier point in time. What happened here at the time of the unfortunate death, although it may be relevant, it seems a very limited relevance to that issue of whether when the product was put into commerce, it was unreasonably dangerous. Oh, no, your honor. It goes to the defense of unreasonable use, defense which is an absolute defense under the Massachusetts Warranty Law. But at a minimum, it seems like we have a dispute on that because the other employee is saying, I'm going in there all the time. This is what I do. This is my job. So you say, one supervisor said to the decedent, never go in there, and then another guy is going to testify, I had that job and I went in there all the time. Well, a couple of things on that, your honor. First, the admissible testimony, which is the standard here, is uniform, and that is he was never supposed to go in there. The only people who were supposed to go in there were who were certified in lockout-tagout. That's from Craig Perry, several times in his two depositions, and Mr. Prieto was not one of them. So what would Pond say? Well, Pond's testimony is inadmissible. I asked what he would say, not whether you think it's inadmissible. Oh, Pond, who had worked there several months or maybe a year before Mr. Prieto, said, oh, I was there all the time. I had to go in there several times a day, whatever, to clean up slag and all that kind of thing. The answer to that question is what Mr. Gillette said. When I asked him that question, there were six things that Mr. Foster put in his brief about why they may have to go in there, and I asked Mr. Gillette, were any of those present at the time that Mr. Prieto was in there, and his answer was no. So the truth is that it doesn't matter. The issue is what is Mr. Prieto doing where he's not supposed to be, where he knows he's not supposed to be? What's that dispositive of? What does that do for you? I mean, I guess on a failure-to-warn claim under the negligence label, that seems important. It might be hard to establish a failure-to-warn claim under those facts, but I'm still struggling to see how that's at all relevant to the merchantability claim. Because, Your Honor, under Correa, if there is an unforeseeable use, a use that is not reasonably foreseeable or misuse of the product, there's no warranty that goes to that, and that is exactly what we have here. Everybody knows, including Mr. Prieto, that he wasn't supposed to be there, and so the question is what is he doing? Is he picking up stuff off the floor? Mr. Gillette said he's not picking up stuff off the floor. He wasn't there. Was he supposed to? No. Was he instructed repeatedly not to do that? Yes. When two weeks before this, he gets screamed at by his foreman, Mr. Vasquezzi, who said in his testimony, I read him the Riot Act and told him if you do it again, you're probably going to get fired, and he said, I won't do it. But he did. So the real issue is why is he in there? And one of the answers to that is, and Mr. Gillette says I can't rule this out, he's playing with the machine. And when... I'm sorry, playing with the machine? He's playing chicken with the machine. Right. So as the thing is coming down, remember this comes down at three inches per second, it's very slow, it takes 30 seconds to go from the top level all the way to the bottom, there's a loud noise, beep, beep, beep, like you hear with trucks backing up, and everybody could hear it, Mr. Gillette admitted in his deposition he could hear it, Mr. Prieto certainly could hear it, he knew it was coming down, and so what is he doing? Why is he there? There's no reason, work-related reason for him to be there at that time that even Mr. Gillette admits that. And so the only explanation is he's doing something else that has not anything to do with the... Gillette is the expert. Gillette, I'm sorry, is the expert for the plaintiff. How would the expert know whether he was picking up a piece of metal? Because I asked him if there was anything found that was on the floor at that time, and he said no. And by the way, remember, there's only, if you look at the pictures that are attached to our addendum in our brief, you can see there's only a 12-inch space like there, and if you have to squeeze and shimmy all the way over eight feet over next to where the operator was, which he did, you can't reach down and pick anything up. So you're saying, just so I understand, assume for a minute Mr. Pond's testimony is what it is, which is people do need to go in there sometimes to pick stuff up. And let's also assume we can imply that knowledge to Cincinnati that they would understand when they built the product, that sometimes people would have to go in there to pick stuff up. And you're saying it is a complete defense of liability that at this moment, this person who went in there like that other person would have, but actually didn't need to pick stuff up at that moment, that would be a defense to not having the security that would be needed when you did expect people to go in there? Well, there's two answers to that, Your Honor, if I may. The first is that if people have to go in there, Cincinnati knows and everybody in this industry knows that you have to be lockout, tagout. The second is they do put an awareness barrier on that space precisely to prevent this. And the question that Your Honor asked earlier was, is that sufficient? And the answer is yes. And how do I know that? Mr. Gillette testified it was in his deposition. He said it was a reasonable physical barrier. Oh, he said more than that, Your Honor. If you look at page, at the, uh, he said it's on its face reasonable, uh, on its face, reasonable design, uh, of the product. So it's, it's not just on its face reasonable, it was design of the product that I asked him. And, um, when I went back and looked at the counsel, the, the trial court seemed to have put dispositive weight on that one exchange where he acknowledges that placing a physical guard at that one point of entry would have been a reasonable way in which to prevent entry at that point. But he goes on at greater length to assert that there was a need for a safety device that would prevent this kind of accident from happening if the entry had occurred at any one of the three points, even if his testimony is somewhat inconsistent. Why isn't that a jury issue? What permits the court to put dispositive weight on that one exchange in light of all the other testimony that he gives? Well, two things, Your Honor. First is that, uh, there was not just one exchange. He said it seven or eight times in his deposition that that was reasonable or reasonably designed or the product was reasonable with the barrier in place. Everybody agrees that, that it was in place. Second, he also said that, um, well, two other parts. One is that, uh, safety mats, switch mats, which Cincinnati knew were not supposed to be there because they entice people to come in. And Mr. Gillette even admitted that, uh, and it's just like the elevator. When you put your hand in an elevator now to keep it open, if it doesn't, if it doesn't work. That's a great argument to the jury. We don't need that because it'll induce people to come in. That's like the classic question. Should we have a kill switch or shouldn't we? Well, here's our argument why we shouldn't. Okay. Right. But I'm saying it wasn't a willy nilly decision. You are. They thought this through. And the third issue is I asked at the end of the deposition, as you run, as I'm sure saw. I thought it through, but isn't it up to a jury to say, did they make the wrong choice? No. Your Honor. And the reason is at the end of the, of his deposition, the last part of the deposition on page 171 and 172, I believe, um, I asked him if Mr. Prieto was doing that day, what he had done two weeks before, uh, would this have mattered? Because you can, even if you have a switch mat in there, you can avoid it by just standing on top of a little shelf that's on the bottom of the, of the, uh, um, of the loader. And he said it wouldn't matter. So it's the same thing that goes back to the fact that the, the fence was taken down, even though it was supposed to be up. And even though it had been there at the time. So the first question goes, was the product reasonably fit for its intended and foreseeable uses at the time it was installed? And the answer to that is clearly yes. Um, because Mr. Gillette said it was, uh, it's not what he said, counsel, pardon? Thank you. I'm sorry. I'm sorry. Thank you. Honestly. Thank you. Thank you. Counsel. That concludes argument in this case.